AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT
7/20/21

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
) Case No. 3:21MJ266
THE CELLULAR TELEPHONE ASSIGNED CALL )
NUMBER (937) 607-7477, WITH INTERNATIONAL )
MOBILE SUBSCRIBER IDENTITY 311480421763273 )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the   Southern   District of   Ohio   , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Possession With Intent to Distribute Methamphetamine and Fentanyl and Conspiracy to Commit the Same. |

The application is based on these facts:
See affidavit of SA Joshua Hilberbran

☑ Continued on the attached sheet.
☑ Delayed notice of  30  days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*To ensure technical compliance with the Pen Register Statute, 18 U.S.C. §§ 3121-3127, this warrant also functions as a pen register order. Consistent with the requirement for an application for a pen register order, I, Ryan A. Saunders, an "attorney for the government" certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the DEA. See 18 U.S.C. §§ 3122(b), 3123(b).

JOSHUA HILDERBRAN
Digitally signed by JOSHUA HILDERBRAN
Date: 2021.07.20 14:55:29 -04'00'
*Applicant's signature*

SA Joshua D. Hilderbran, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
FaceTime   *(specify reliable electronic means)*.

Date:  7/20/21
*Judge's signature*

City and state:   Dayton, Ohio     Hon. Sharon L. Ovington, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (937) 607-7477, WITH INTERNATIONAL MOBILE SUBSCRIBER IDENTITY 311480421763273 | Case No. __3:21MJ266__<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Joshua D. Hilderbran, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (937) 607-7477, with International Mobile Subscriber Identity 311480421763273, with listed subscriber(s) No NAME (hereafter referred to as "**Target Cell Phone**"), whose service provider is Verizon, a wireless telephone service provider. The **Target Cell Phone** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3. I am a Special Agent with the United States Drug Enforcement Administration (DEA), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 21, United States Code, Section 878. The information contained in this Affidavit is either personally known by me or relayed to me by other law enforcement officers involved in this investigation. I have been employed as a Special Agent by the United States Department of Justice, DEA, since January 2011 and am currently assigned to the DEA Dayton Resident Office (DRO). In January 2011, I reported to DEA Basic Agent Training in Quantico, Virginia. In May 2011, I completed the 17 week Basic Agent Training Academy at the DEA Justice Training Center in Quantico, Virginia. While attending Basic Agent Training, I received instruction on topics including narcotics identification, surveillance techniques, methods of operation of narcotics traffickers, law, evidence handling, undercover operations, current trends/patterns involving the distribution of narcotics, as well as other areas of drug enforcement. Prior to my employment with the DEA, I served as an Officer/Counter Sniper with the United States Secret Service, Uniform Division in Washington, D.C. from June 2007 to January 2011.

4. During my career with the DEA, I have participated in multiple controlled substances investigations, including investigations involving marijuana, cocaine, heroin, methamphetamine, Fentanyl, LSD, and prohibited pharmaceuticals. I have investigated financial crimes to include; money laundering, structuring habits, and bulk cash smuggling. I have interviewed numerous subjects/defendants involved in and/or arrested for drug violations and have participated in several joint interagency federal and state investigations. I have also acted in an undercover capacity in furtherance of illegal drug investigations. Additionally, I have supervised the use of confidential sources; have conducted physical surveillance; and have

monitored and reviewed recorded conversations of drug traffickers. I have participated in multiple Title III investigations by monitoring lines, supervising monitors, and conducting surveillance to substantiate the Title III interceptions. During the course of these interceptions, I have become familiar with coded terminology utilized by drug trafficking organizations to disguise their illegal activities and the manner in which they conduct these illegal activities. Through my training and experience, including on-the-job discussions with other law enforcement agents and cooperating suspects, I am familiar with the activities of drug smugglers and drug trafficking distribution networks. During the conduct of my official duties, I have authored various affidavits to include, but not limited to, search warrants, arrest warrants, and criminal complaints.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1) and 846 (possession with intent to distribute methamphetamine and fentanyl and conspiracy to commit the same) have been committed, are being committed, and/or will be committed by Justus RUBY and other known and unknown persons. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

7. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court

of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

8. The United States, and the Drug Enforcement Administration (DEA) is conducting a criminal investigation of Justus RUBY, and any other co-conspirators known and unknown regarding possible violations of 21 U.S.C. §§ 841(a)(1) and 846 (possession with intent to distribute methamphetamine and fentanyl and conspiracy to commit the same).

9. In September 2020, a DEA confidential source (hereafter referred to as CS[1]) provided information to investigators stating a friend provided him/her a phone number associated with the WALKER, stating it is used by an individual identified as "Rob". The CS further stated his/her friend indicated Rob can sell methamphetamine or "meth".

10. On October 22, 2020, the CS, as witnessed by your Affiant conducted a series of text messages and calls to and from WALKER. The purpose of the communications were to establish a controlled purchase of approximately three ounces of meth for the negotiated price of approximately $1,600.00.

11. During the telephonic communications, WALKER indicated numerous times that the CS and a task force office, acting in an undercover capacity (UC1) needed to pick WALKER up and take him to his source of supply (SOS). As a result, investigators canceled the attempted controlled purchase on that date. Subsequently on the same date, UC1 established telephonic communication with WALKER.

---

[1] The CS previously cooperated for judicial consideration in his/her unrelated judicial case. The CS has provided information that has been reliable and corroborated through investigative efforts. The CS's criminal history includes: driving under the influence and obstructing official business, domestic violence and assault, possession and trafficking of narcotics, and money laundering

12. On October 23, 2020, UC1 re-established telephone communications with WALKER. During said conversations, WALKER again indicated he needed to be picked up to meet with the SOS. During the communications, WALKER advised he wanted paid for his part of the deal. As a result, UC1 negotiated a meeting between WALKER, UC1, and another task force officer, acting in an undercover capacity (UC2) near WALKER's apartment complex at 124 Chestnut St., Englewood, Ohio.

13. On October 23, 2020, UC1 and UC2 met with the person named Robert WALKER. During the meeting, WALKER provided UC1 phone number, 937-607-7477 (**Target Cell Phone**), stating it belonged to, "Jose". Soon after, telephonic communications were established between UC1 and the user of the **Target Cell Phone.** On October 23, November 10, November 20, twice on December 29, 2020, January 29, 2021 and May 28, 2021 undercover agents purchased methamphetamine and during each instance, the undercover agents have negotiated the drug transactions with user of the **Target Cell Phone**.

14. During the January 29, 2021 transaction, UC1 established telephonic communications with the **Target Cell Phone**. On this date, UC1 purchased methamphetamine from Justus RUBY. During early surveillance, investigators observed RUBY, wearing dark jeans and a purple hoodie, exit his apartment at 711 W. Wenger Rd., #217, Englewood, Ohio.[2] RUBY entered a white Chevrolet Equinox, North Carolina license plate, HEW2793, registered to Avis Budget Rental, and depart. A subsequent Administrative Subpoena to Avis revealed RUBY as the renter of the Equinox on this date. Surveillance was maintained on RUBY and the Equinox as it traveled to the apartments of Kensington Square Apartments, 700 Keswick Cir. Trotwood,

---

[2] A prior administrative subpoena indicated that RUBY resided at 711 W. Wenger Rd., #217, Englewood, Ohio.

Ohio. Prior to arriving at Kensington Square, telephonic contact was made between RUBY and UC1, wherein, RUBY told UC1 he was grabbing the, "Shit" for UC1. In the aforementioned apartment complex, investigators observed RUBY stop and park in a small lot on the southwest side of the Kensington Square Apartments. At the Kensington Square Apartments, it is unclear to investigators if RUBY had exited the Equinox. The area where RUBY was parked was later determined to be in the immediate area of Kensington Square Apartments, 715 Hallworth Pl., Trotwood, Ohio, as indicated in paragraph 19.

15. Subsequently on the same date, RUBY departed the area of 715 Hallworth Pl., Trotwood, Ohio and surveillance observed the Equinox meet car door to door with UC1 and another law enforcement officer, acting in an undercover capacity (UC3), in the area of 101 W. Worley Ave., Trotwood, Ohio. Per UC1, it was at that time, the driver of the Equinox proceeded to exchange the negotiated three ounces of suspected methamphetamine in an exchange for $1,400.00. Per UC1, during the exchange, he/she did not positively identify RUBY as the driver of the Equinox; however, UC1 observed the driver as a black male wearing a purple hoodie. Following the transaction, surveillance lost visual of the Equinox for a short time before reestablishing visual back at RUBY's apartment, 711 W. Wenger Rd., Englewood, Ohio. At the apartment, investigators observed RUBY wearing the previously mentioned purple hoodie, exit the Equinox and enter his apartment building through the south side communal door.

16. On the same date, investigators transported the suspected methamphetamine to the Dayton Resident Office where it field tested presumptive positive. Subsequently, the Northcentral Laboratory identified the purchased substance as meth hydrochloride.

17. On May 17, 2021, UC1 re-established telephonic communications, via text, with the user of the **Target Cell Phone**, for the purpose of establishing a future purchase of meth.

18. On May 27, 2021, your Affiant, with the assistance of federal search warrant GPS location data for the **Target Cell Phone**, authorized by the Honorable Magistrate Judge Sharon L. Ovington on May 19, 2021, conducted surveillance. At approximately 10:14 a.m., the GPS location data placed the **Target Cell Phone** in the area of Kensington Square Apartments, 700 Keswick Cir. Trotwood, Ohio, with an approximate radius of 1,058 m. Prior to that GPS update, the GPS location data placed the **Target Cell Phone** during the early morning hours in the area of RUBY's apartment, 711 W. Wenger Rd., Englewood, Ohio at varying ranges including, but not limited to: 443 m., 653 m., 719 m., and 593 m.

19. Your Affiant established surveillance on the Kensington Square Apartments situated on the southwest side of the complex. Subsequently, your Affiant observed RUBY and a second individual, who appeared to be WARFIELD[3], wearing a yellow over black jacket, exit apartment #715 and depart in a black Ford Edge, Ohio license plate, JJF8641, registered to PV Holdings Corp. The apartment address was identified as 715 Hallworth Pl., Trotwood, Ohio. A subsequent Administrative Subpoena to PV Holdings Corp. revealed RUBY as the renter for the Edge. On the same date, during an ongoing text messages between UC1 and the user of the **Target Cell Phone**, the user told UC1, "Jus cum tomorrow my bro gone get u right". Your Affiant knows the conversation was in regard to purchasing meth. Additionally, based on the surveillance observations and data gleaned from the GPS locates for the **Target Cell Phone**, your Affiant believed RUBY to possess the **Target Cell Phone** on that date.

20. On May 28, 2021, UC1 continued to negotiate the meth purchase with the user of the **Target Cell Phone**. During a series of conversations via text, UC1 told the user of the

---

[3] During the investigation of RUBY and others, law enforcement has purchased methamphetamine from Warfield. This controlled drug purchase occurred on October 23, 2020.

**Target Cell Phone** that he/she wanted some, "Cream", which is coded language for meth. UC1 further advised he/she possessed, "1500". The user of the **Target Cell Phone** later affirmed, stating, "Yea come on". Soon after, your Affiant received a GPS locate for the **Target Cell Phone** in the area of Kensington Square Apartments, 700 Keswick Cir., Trotwood, Ohio, with an approximate radius of 961 m. Based on the GPS location data, investigators established surveillance on 715 Hallworth Pl., Trotwood, Ohio. During a series of exchanged telephonic communications, the user of the **Target Cell Phone** continued to direct UC1 where to travel in order to conduct the meth purchase. Subsequently, investigators observed two black males, one wearing the same yellow over black jacket, mentioned in the previous paragraph, exit 715 Hallworth Pl., Trotwood, Ohio and enter a black Jeep Grand Cherokee. Surveillance was lost on the Cherokee soon after it departed 715 Hallworth Pl., Trotwood, Ohio. A few minutes later, a black Jeep with two black males met with UC1 in an area just north of the intersection of Wolf Creek Pike on Seybold Rd., Trotwood, Ohio and exchanged approximately three ounces of meth for $1,500.00. During the meet, UC1 observed what he/she believed to be a North Carolina license plate on the Jeep. According to UC1, he/she observed the passenger wearing a yellow and black shirt. Surveillance again was lost on the Jeep following the exchange. The conversations in this paragraph are not all inclusive nor verbatim.

21. Subsequently, the suspected meth was transported to the Dayton Resident Office where the item field tested presumptive positive for meth and were subsequently submitted to the Northcentral Laboratory for analysis and storage.

22. On June 8, 2021, your Affiant conducted surveillance at 715 Hallworth Pl., Trotwood, Ohio. During surveillance, your Affiant observed a black male, with a black t-shirt and a left forearm black tattoo, later identified on June 9, 2021 as J'Juan BAILEY, via an

Ohio driver's license photo, exit 715 Hallworth Pl. and enter a gray Toyota, Florida license plate, KCKR83, registered to EAN Holdings LLC.  Your Affiant contacted EAN Holdings LLC, Law Enforcement Relations, requesting the renter information for the Toyota. EAN Holdings identified BAILEY of 5958 Leafridge Ln., Columbus, Ohio as the renter of the Toyota.

23. Additionally, your Affiant identified BAILEY's Ohio driver's license number as TY686713.  Using the driver's license number, your Affiant located a driver's license photo of BAILEY which your Affiant associated with the driver of the Toyota, mentioned in in the previous paragraph.  On the same date, your Affiant contacted EAN Holding LLC, Law Enforcement Relations, requesting all vehicle rental information for BAILEY from May 1, 2021 to June 6, 2021.  EAN Holdings indicated BAILEY had rented a black Jeep Cherokee, North Carolina License plate, JAS4029, from May 14, 2021 to June 2, 2021.  This would coincide with law enforcement observations during the drug transaction on May 28, 2021 that a black Jeep with possible North Carolina license plate sold UC1 methamphetamine.

24. On July 14, 2021, your Affiant received current search warrant authorized GPS locate for the **Target Cell Phone**, signed on June 21, 2021, as authorized by the Honorable Magistrate Judge Peter B. Silvain, indicating the **Target Cell Phone** was in the area of RUBY's apartment, with an approximate radius of 593 m.  Based on that, your affiant established surveillance on Ruby's apartment.  Parked in the lot was a black 2021 Chevrolet Malibu, Ohio license plate, JHR1471, registered to PV Holdings.  A subsequent Administrative Subpoena submitted to Avis Budget/PV Holdings revealed RUBY as the renter for the Malibu.  Shortly after, your Affiant observed RUBY wearing a white t-shirt, gray pants, and a black do-rag head covering exit the south side entrance of his apartment, enter the Malibu, and depart.  Surveillance was maintained on RUBY as he traveled to 715 Hallworth Pl., Trotwood, Ohio.  At

approximately 11:05 a.m., your Affiant observed RUBY back into a spot near the front door of the 715 Hallworth Pl., exit the Malibu, and enter 715 Hallworth Pl. A few minutes later, your Affiant observed RUBY exit 715 Hallworth Pl. and depart in the Malibu. The Malibu traveled west on Shiloh Springs Rd. and then south on Seybold Rd., Trotwood, Ohio. SA David Ashley observed the Malibu on the side of the road facing northbound. The Malibu was parked beside a light-colored SUV with an Indiana license plate, driven by an unknown white male, facing southbound. SA Ashley observed the plate to be NJB983; however, a law enforcement database check from the plate returned negative for a registered owner. Investigators surmise SA Ashley misread the plate. Additionally, SA Ashley observed, a south facing blue Chevrolet Cobalt with Indiana license plate, 669DFO, on the southbound berm, driven by a white female with three other occupants in the vehicle.

25. Immediately, SA Ashley observed the Malibu depart from the SUV then turn around and go south bound on Seybold Rd. The light-colored SUV turned around northbound and departed the area. Surveillance was not maintained on the light colored SUV. Investigators then observed the black Malibu park in the middle of the roadway beside the blue Cobalt. Based on SA Ashley's training and experience, the nature of the case, and prior dealings with RUBY, SA Ashley believed that he was observing car-to-car drug transactions.

26. SA Ashley continued to Wolf Creek Pike and turned around then headed back northbound on Seybold Rd. At or around that time, SA Ashley observed the blue Cobalt still parked on the side of the street and the Impala had departed the area. SA Ashley continued to Shiloh Springs Rd. and waited for the Cobalt to return northbound. A short time later, SA Ashley observed the Cobalt drive west on Shiloh Springs and surveillance was initiated on the Cobalt at that time. Simultaneously, your Affiant re-established surveillance on the Malibu as it traveled

east on Shiloh Springs Rd. Your Affiant maintained surveillance on the Malibu as it returned to 715 Hallworth Pl., Trotwood, Ohio. A few minutes later, your Affiant observed RUBY exit the Malibu and enter 715 Hallworth Pl.. At that time, your Affiant terminated surveillance at 715 Hallworth Pl. to assist SA Ashley in surveilling the Cobalt.

27. On the same date, pursuant to SA Ashley's observations wherein, the Malibu conducted two brief vehicle car to car meets, SA Ashley contacted Ohio State Highway Patrol (OSHP) Trooper Jerrod White, who was on patrol in the area of highway 70, requesting assistance on a traffic stop of the Cobalt. According to SA Ashley, the request to traffic stop the Cobalt was derived from SA Ashley's training and experience wherein the brief door to door meets can often be associated with drug transactions. At approximately 11:50 a.m., Trooper White conducted a traffic stop on the Cobalt in the area of mile marker 3, highway 70, near New Westville, Ohio. During the traffic stop, Troopers White and Kyle Pohlabal, who had arrived to support Trooper White, removed four occupants from the vehicle and verbally advised said occupants of their *Miranda* rights. Subsequently, the front passenger of the Cobalt, admitted to possessing a, "Ball of Fetty" in her underwear. Based on training and experience, your Affiant knows the term, "Ball" is used to describe an eighth of an ounce and, "Fetty" is short for fentanyl. The front seat passenger further indicated that they had purchased the suspected fentanyl for $200.00, from a black male, known as Jose. At that time, the front seat passenger willingly transferred the suspected fentanyl to investigators.

28. Additionally, the driver of the Cobalt indicated they had met with a black male identified as Jose[4], wearing a black do-rag, driving a black car. The driver further stated Jose

---

[4] On October 23, 2020, UC1 and UC2 met with the person named Robert WALKER. During the meeting, WALKER provided UC1 phone number, 937-607-7477, stating it belonged to, "Jose".

11

provided his phone number of 937-607-7477 (**Target Cell Phone**) to the driver during the meet. At that time, the driver consented to your Affiant and SA Ashley to review the contents of her phone. Your affiant observed a contact in her phone identified as, "Jose D Town" associated with the phone number of the **Target Cell Phone**. Both the driver and front seat passenger advised the deal with "Jose" was set up before they left Indiana. They did not provide more information as to who set up the deal.

29. Following the encounter, all four occupants were released pending further investigation. The suspected fentanyl was transported to the Dayton Resident Office where it field tested presumptive positive for fentanyl and was later submitted to the Northcentral Laboratory for storage and analysis

30. Based on the surveillances and GPS locates for the **Target Cell Phone** described in the previous paragraphs, your Affiant believes RUBY and/or others continues to possess the **Target Cell Phone** and the **Target Cell Phone** is still being utilized to distribute and orchestrate controlled substances.

31. As mentioned above, on October 30, 2020, your Affiant applied for and was granted a GPS Locate Search Warrant for the **Target Cell Phone**, as authorized by The Honorable Judge Michael J. Newman. On November 25, 2020, your Affiant applied for and was granted an extension for a GPS Locate Search Warrant for the **Target Cell Phone**, as authorized by The Honorable Judge Sharon L. Ovington. On December 28, 2020, your Affiant applied for an extension for a third GPS Locate Search Warrant for the **Target Cell Phone**, as authorized by The Honorable Judge Stephanie K. Bowman. On January 27, 2021, your Affiant applied for and was granted a fourth GPS Locate Search Warrant for the **Target Cell Phone**, as authorized by The Honorable Judge Sharon L. Ovington. On May 19, 2021, your Affiant applied for and was

granted a renewed GPS Locate Search Warrant for the **Target Cell Phone**, as authorized by The Honorable Judge Sharon L. Ovington.  On June 21, 2021, your Affiant applied for and was granted a renewed GPS Locate Search Warrant for the **Target Cell Phone**, as authorized by The Honorable Judge Peter B. Silvain. During the previous court authorized tracking period, investigators have conducted surveillance and a traffic stop that yielded suspected fentanyl. Based on training and experience, your Affiant believes a search warrant authorizing updated GPS location data for the **Target Cell Phone**, will assist investigators in conducting surveillance on its user and further identify any vehicles and drug stash houses the user may occupy.

32. In my training and experience, I have learned that Verizon is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records.  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise that E-911 Phase II data.

33. Based on my training and experience, I know that Verizon can collect E-911 Phase II data about the location of the **Target Cell Phone**, including by initiating a signal to determine the location of the **Target Cell Phone** on Verizon network or with such other reference points as may be reasonably available.

34. Based on my training and experience, I know that Verizon can collect cell-site data about the **Target Cell Phone**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as Verizon typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes

## AUTHORIZATION REQUEST

35. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

36. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target Cell Phone** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify

confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

37. I further request that the Court direct Verizon to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Verizon. I also request that the Court direct Verizon to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Verizon's services, including by initiating a signal to determine the location of the **Target Cell Phone** on Verizon 's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate Verizon for reasonable expenses incurred in furnishing such facilities or assistance.

///
///
///
///
///
///
///

38. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Cell Phone** outside of daytime hours.

Respectfully submitted,

JOSHUA HILDERBRAN
Digitally signed by JOSHUA HILDERBRAN
Date: 2021.07.20 14:55:59 -04'00'

Joshua D. Hilderbran
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on this __20th__ day of July, 2021.

Sharon L. Ovington
United States Magistrate Judge

16

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone assigned call number (937) 607-7477, with International Mobile Subscriber Identity 311480421763273, with listed subscriber(s) No NAME **(**the "**Target Cell Phone**"), whose wireless service provider is Verizon, a company headquartered at Bedminister, New Jersey.

2. Records and information associated with the **Target Cell Phone** that is within the possession, custody, or control of Verizon:  including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

**I. Information to be Disclosed by the Provider**

All information about the location of the **TARGET CELL PHONE** described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the **TARGET CELL PHONE**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Verizon, Verizon is required to disclose the Location Information to the government. In addition, Verizon must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Verizon's services, including by initiating a signal to determine the location of the **Target Cell Phone** on Verizon's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Verizon for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

II. **Information to Be Seized by the Government**

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846 (possession with intent to distribute methamphetamine and fentanyl and conspiracy to commit the same) involving Justus RUBY, and others known and unknown.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.